**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARCIA LYNN HUNTER,**

      **Plaintiff,**

**v.**                                                        **Case No.: 3:10-cv-00905**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 10 and 11). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 3 and 4).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    **Procedural History**

Plaintiff Marcia Lynn Hunter (hereinafter "Claimant"), protectively filed applications for DIB and SSI on August 22, 2006, alleging that she had been disabled

1

since October 1, 2004, due to "fast heart rate, leaky heart valves, high blood pressure, shortness of breath, chest pain, GERD, shoulder problems, carpel tunnel and inability to lift or do overhead work." (Tr. at 113, 118, 91-95, 96-99). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 54-69). Claimant requested an administrative hearing, which was conducted on August 18, 2008 by the Honorable Michelle D. Cavadi, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 24-49). By decision dated October 10, 2008, the ALJ determined that Claimant was not disabled under the Security Act prior to August 24, 2007, but became disabled on that date and remained disabled through the date of the decision. (Tr. at 22). The Appeals Council thereafter denied Claimant's request for review. (Tr. at 1-3). Plaintiff instituted this instant civil action on July 14, 2010 seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §405(g). (Docket No. 1). The Commissioner filed an Answer and a Transcript of Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7, 9, 10, and 11). Consequently, the matter is ripe for resolution.

## II.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§

404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ noted as a preliminary matter that Claimant's current DIB and SSI applications allege an onset date of October 1, 2004 which falls within the previously adjudicated period of the ALJ's decision entered on December 13, 2005; therefore, the ALJ observed that Claimant submits an implied request for

reopening of the prior decision.[1] (Tr. at 10). The ALJ found that Claimant did not submit any new evidence material to the previous determination and that there was, therefore, no good cause for reopening the ALJ's previous decision and the unfavorable determinations on the applications stood as final and binding. (*Id.*).

Also as a preliminary matter, the ALJ determined that Claimant met the insured status requirements of the Social Security Act through June 30, 2010. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since October 1, 2004, the alleged disability onset date. (*Id.,* Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the severe impairments of chronic right knee pain (status/post deltoid contusion), epigastric discomfort secondary to gastroesophageal/gastrointestinal reflux disease (GERD) and a hiatal hernia, with a 27-year history of cigarette smoking with chronic obstructive pulmonary disease (COPD), and chronic cervical and lumbar strain. (Tr. at 13, Finding No. 3). Under the third inquiry, the ALJ concluded that prior to August 24, 2007, the date that she became disabled, Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter the "Listings"). (Tr. at 16, Finding No. 4). The ALJ assessed Claimant's RFC prior to August 24, 2007 as the following:

> [C]laimant had the residual functional capacity limiting her to performing less than the full range of light level work activities. The claimant could lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk for up to six hours per workday and sit for up to six hours per workday. Nonexertionally, the claimant could never climb

[1] The ALJ states that Claimant filed two previous sets of DIB and SSI applications which were denied at the initial level of determination and not appealed further. (Tr. at 10). Claimant's first set of applications was filed on August 24, 1983 and denied on November 29, 1983; her second set was filed on August 17, 2005 and denied on December 13, 2005. (*Id.*).

> ladders/ropes/scaffolds, only occasionally crawl, frequently climb stairs, but could not repetitively use her left upper extremity. The claimant had to avoid concentrated exposure to temperature extremes, fumes/gases/odors and other respiratory irritants, and vibrations.

(Tr. at 17, Finding No. 5) (internal citations omitted). As a result, ALJ concluded that Claimant could not return to her past relevant employment as a cashier/stocker, snack shop operator, telemarketer/product specialist, or house sitter, occupations which required sedentary to light level exertional tasks of an unskilled to semi-skilled nature. (Tr. at 20, Finding No. 6). The ALJ considered that Claimant was 47 years old on the alleged disability onset date, which is defined as a "younger individual" age 18 through 49 in 20 C.F.R. 404.1563 and 416.963, that she had a high school education with two years of college, and could communicate in English. (*Id.*, Finding Nos. 7 and 8). The ALJ concluded that transferability of job skills was not an issue under 20 C.F.R. 404.1568 and 416.968.[2] (*Id.*, Finding No. 9). Accordingly, based on the testimony of the vocational expert, the ALJ found that Claimant could make a successful adjustment to other work that existed in significant numbers in the national economy, such as clerical jobs, cashier, and hand packer at the light level of exertion and non-emergency dispatcher, unskilled clerical jobs, and telephone order clerk at the sedentary level of exertion. (Tr. at 20-21, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled prior to August 24, 2007. (Tr. at 21). However, the ALJ found that beginning on August 24, 2007, the severity of Claimant's thyroid papillary carcinoma met the requirements of section 13.09 of Appendix 1 to Subpart P of the Administrative Regulations (hereinafter "Listing 13.09"). (*Id.*, Finding No. 11). Therefore, the ALJ concluded that Claimant was not disabled prior to August 24, 2007, but became

---

[2] The Medical-Vocational Rules supported a finding that she was not disabled regardless of whether she had transferable job skills.

6

disabled on that date and continued to be disabled through the date of the decision. (Tr. at 22, Finding No. 12).

## III.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner partially denying Claimant's applications for benefits is supported by substantial evidence. In *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972), substantial evidence was defined as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Blalock v. Richardson, *supra* at 776, quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).

Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990). The Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.* However, the Court must not "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th

Cir. 1987).

## IV.    __Claimant's Background__

Claimant was 47 years old on the date of her alleged disability onset. She completed high school and nursing and computer vocational technical programs. (Tr. at 31). She reported having significant difficulty in math and reading while in school, but that special assistance was only available in reading which she received from second grade until she graduated from high school. (Tr. at 398). She was never retained, but reported that she "failed math" and had to repeat it several times. (*Id.*). However, she was the "top student" in her nursing assistant program. (*Id.*). She worked as a nursing assistant for approximately 12 years, then as a private duty nurse for family members following a car accident in 1986, as well as three years of secretary/payroll clerk. (*Id.*). Her past relevant work history also included employment as an owner/operator of a snack shop, a product specialist, and a telemarketer. (Tr. at 32). Claimant is able to read and write in English and perform basic mathematics. (Tr. at 31).

## V.    __The Medical Evidence__

The Court has reviewed the medical records in their entirety and briefly summarizes the pertinent evidence below.  As noted, the ALJ found Claimant disabled as of August 24, 2007, the date on which a fine needle aspiration revealed that Claimant had papillary thyroid carcinoma and for which she subsequently underwent a thyroidectomy and other treatment. Therefore, the following discussion is limited to records relating to Claimant's physical and mental conditions prior to August 24, 2007.[3]

---

[3] Although the relevant time period actually is December 14, 2005 (one day after the prior denial) through August 24, 2007, the Court considered historical information to the extent that it elucidated Claimant's condition during the applicable period.

### A.  <u>Treatment Records</u>

In 1980, Claimant underwent gastric stapling for morbid obesity; at the time of her surgery, Claimant weighed 350 pounds. (*See* Tr. at 285). She initially lost 100 pounds and maintained her weight for at least ten years, but then regained some weight and was diagnosed with diabetes. (*Id.*). She lost approximately 70 pounds and controlled her diabetes with diet. (*Id.*). She complained of reflux, chest pain, and shortness of breath related to her gastric surgery. (*Id.*). However, her reflux improved with Nexium. (*Id.*).

Claimant was involved in a motor vehicle accident in 1986.  (Tr. at 247, 249). She suffered a Grade I to II acromioclavicular ("AC") separation of the left shoulder and neck injuries. (Tr. at 249). She presented to Michael E. Kilkenny, M.D., on September 24, 1991 complaining bitterly of intolerable pain at the AC joint and numbness extending to her left hand; she had an inconsistent exam regarding tenderness at the AC joint on the left side, a full range of motion in the shoulder, and no apparent deformity, but nerve conduction studies showed mild left carpel tunnel syndrome. (Tr. at 249). Dr. Kilkenny treated her with nonsteroidals and a wrist splint, but she complained that these treatments were not helping and her shoulder continued to hurt. (*Id.*).

Two years later, Claimant reportedly developed numbness in her thumb, index, and middle fingers on her left hand and in 1992, she reported occasional pain and paresthesias at nighttime. (Tr. at 247). Although she attributed these conditions to her accident, Earl J. Foster, M.D, determined that the association was unlikely. (Tr. at 248). Dr. Foster's impression was that Claimant suffered from carpel tunnel syndrome on her left side. (*Id.*). On January 6, 1992, nerve conduction studies were consistent with mild carpel tunnel syndrome, but electromyography ("EMG") studies were normal. (Tr. at

246). On May 31, 1994, Claimant continued to complain of numbness in her hands, but EMG studies showed no evidence of carpel tunnel syndrome. (Tr. at 245).

Claimant was involved in a second motor vehicle accident on June 2, 2004. (Tr. at 225). She alleges that she "broadsided" a car that ran a red light and her right knee hit the dashboard. (Tr. at 240). She was examined six days later by Jack Steel, M.D., at Scott Orthopedic Center, Inc. Dr. Steel's impression was that Claimant had a left shoulder deltoid contusion with mild rotator cuff strain, right knee posterior capsular injury with no gross instability and anterior knee contusion, and a chest wall contusion. (Tr. at 242). Dr. Steel performed an arthroscopic-assisted endoscopic right hamstring anterior cruciate ligament ("ACL") reconstruction to repair Claimant's right knee injury on October 1, 2004. (Tr. at 185-187).

On October 28, 2004, Claimant was seen by Denise Clay, M.D., because of reported high blood pressure following her ACL repair; however, her blood pressure was normal on examination. (Tr. at 218). Dr. Clay noted that Claimant smoked since age 17 and consumed alcohol. (*Id.*).  She had no history of asthma, COPD, or hepatitis. (*Id.*). Claimant stated that her blood sugar was back to normal due to weight loss. (Tr. at 219).

On December 19, 2004, Dr. Clay noted that Claimant never brought in a list of her blood pressures as requested; therefore, the only evidence of elevated blood pressure was when she was on anesthesia and that she otherwise had excellent blood pressure. (Tr. at 220). Claimant has no new complaints and reported that she quit smoking. (*Id.*).

On July 15, 2005, Claimant remained concerned about her blood pressure. (Tr. at 270). She reported that it was 124/120 or some other "improbable level." (*Id.*). However, on September 9, 2005, her blood pressure control was good. (Tr. at 269).

Claimant was very anxious; she was trying to exercise more and reported being worn out afterwards. (*Id.*).

On September 20, 2005, Claimant's cardiac rhythm was recorded with a Holter monitor for 23 hours and 48 minutes. (Tr. at 293). She had a baseline rhythm sinus with normal variation in heart rate and occasional ventricular and supraventricular ectopic breaks. (*Id.*). It was concluded that Claimant's symptoms did not appear to correlate with any arrhythmias. (*Id.*). The examination was later described as revealing "nothing of significance." (Tr. at 268).

On October 12, 2005, Dr. Steel noted that Claimant was doing well one year post right ACL reconstruction. (Tr. at 223). Claimant and Dr. Steel were pleased with Claimant's progress regarding her knee; pivot shift was negative, Lachman's had minimal excursion on the solid endpoint, her knee hyperextended 5 degrees and flexed to 140, and her McMurray's sign was pain free. (*Id.*). However, Claimant reported recurring tachycardia. (*Id.*).

On November 21, 2005, Claimant underwent a treadmill stress test to assess her chest pain. (Tr. at 292). On a standard Bruce protocol for 8 minutes and 20 seconds, she achieved a maximum workload of 9.3 METS, an equivocal ECG, an appropriate heart rate and blood pressure response to exercise, and peak double product of 31,680. (*Id.*). A treadmill stress test with nuclear perfusion was recommended based on the equivocal ECG reading. (*Id.*).

On December 12, 2005, Claimant reported that she did well on her stress test and that she was in no pain; her discomfort was assessed to be likely due to gastrointestinal problems, as she had gastric weight loss surgery 15 years prior. (Tr. at 266).

On January 19, 2006, an upper gastrointestinal ("UGI") series revealed a status post obesity surgery change of the proximal stomach and apparent small sliding hiatal hernia without reflux, but the examination was otherwise unremarkable. (Tr. at 288). On the same date, two views were taken of her chest to assess her complaints of wheezing and bronchitis, but the examination was negative; her heart and lungs were within normal limits. (Tr. at 289).

On April 27, 2006, Claimant was seen at Ebenezer Medical Outreach. (Tr. at 265). Her symptoms of atypical chest discomfort and occasional dyspnea were determined to be almost certainly related to her gastric problem for which Nexium provided some relief. (*Id.*). Her lungs were clear and she reported kayaking and riding her bicycle to keep in shape and that she had no pain during exercise. (*Id.*).

On May 5, 2006, Claimant followed up with the physician who performed her gastric stapling surgery, Mauricio Saleme, M.D., complaining of shortness of breath, reflux, and vague chest pain. (*Id.*). She was still overweight, weighing 223 pounds. (*Id.*). Her blood pressure was 128/90. (Tr. at 286). Dr. Saleme performed an esophagogastroduodenoscopy ("EGD") which revealed that Claimant had gastroesophageal reflux disease (hereinafter "GERD") status post gastric stapling. (Tr. at 287). Claimant was recommended to follow a low fat diet, to avoid late meals and caffeine, and to continue taking Nexium. (*Id.*).

On July 17, 2006, Claimant was seen by Silvestre Cansino, M.D., at University Cardiovascular Services for hypertension and tachycardia which she developed immediately following her knee surgery two years prior and for which she was taking 100 milligrams per day of Toprol-XL-XL, 3.75 milligrams of Maxzide, and 40 milligrams of Nexium, and 40 milligrams of Lasix once per week. (Tr. at 272 and 274). She also

complained of shortness of breath not related to exertion and sometimes occurring during rest. (Tr. at 272). Dr. Cansino reviewed that on her December 2005 stress test, she exercised for 8 minutes and 20 seconds achieving a workload of 9.3 METS; that her EKG was unremarkable with unsloping ST segment depression and no chest pain; and that her September 2005 Holter Monitor Study showed normal sinus rhythm with rare PVCs and rare PACs. (*Id.*). Also, Claimant reported that she checked her blood pressure at home and it was within normal limits other than during her menstrual cycle. (*Id.*). She stopped smoking in December 2004 after smoking for 27 years. (*Id.*).  Her blood pressure was 131/86. (*Id.*). She was assessed as having hypertension and shortness of breath, was scheduled for stress testing and an EKG, and directed to return to the clinic in 3 months. (Tr. at 273).

On July 27, 2006, Claimant complained of chest pain. (Tr. at 484). Her EKG showed normal findings; her left and right ventricles were normal in size and function and there was no evidence of stenosis, fluttering, or prolapse of her mitral valve. (*Id.*).

On August 7, 2006, Claimant presented for stress testing at Cabell Huntington Hospital because of chest pain and shortness of breath that she had "on and off" in the last two years that was not related to exertion and was not getting worse, but sometimes limited her activity. (Tr. at 275). A brief examination showed that she had a regular heart rate and that her lungs were clear. (*Id.*). Her myocardial perfusion scan was within normal limits, there were no signs of ischemia, and she had normal ejection fraction. (Tr. at 276). Esam Baryun, M.D., noted that in the EKG exercise stress test, positive changes were seen only in the inferior leads; that Claimant reported chest pain; that she had normal hemodynamic response to exercise, no arrythmias, and mild to moderately reduced functional capacity; and that her Duke Treadmill Score was 0. (Tr. at 277).

13

On January 29, 2007, Claimant's treating physician, Charles E. Turner, M.D., noted that Claimant's main reported symptom was dyspnea on minimal exertion with some chest discomfort. (Tr. at 431). Her blood pressure was 132/88. (*Id.*). She had regular heart tones without gallop and her lung fields were clear. (*Id.*). Because of her dyspnea, Dr. Turner referred Claimant to Alejandro Lorenzana, M.D, for an intergroup consultation on May 14, 2007. (Tr. at 432). She had no heart palpitations which Claimant stated was because she was on medication and claimed that she otherwise had an elevated heart rate. (*Id.*). Her blood pressure was 126/80. (Tr. at 434). Pulmonary function tests suggested COPD of the emphysematous type, although there was no air trapping or hyperinflation. (*Id.*). Dr. Lorenzana ordered a CT scan due to a mass in Claimant's neck and planned to check for hepatitis C due to her history of blood transfusions. (Tr. at 435).

On May 15, 2007, a CT scan of Claimant's neck showed a nearly 2 centimeter hypodense right thyroid lobe mass. (Tr. at 425). Laboratory results were also positive for a past or present HCV (hepatitis C virus) infection. (Tr. at 426).

On June 5, 2007, Claimant was seen for follow-up regarding her dyspnea. (Tr. at 441). She stated that she felt a 25 percent improvement in her breathing due to the medication Spiriva and that the tightness was partially relieved. (*Id.*). Her blood pressure was 122/70 and physical examination was completely normal. (*Id.*). She needed a fine needle aspiration of the nodule on her thyroid. (Tr. at 442). Her problems were listed as dyspnea, COPD, a thyroid nodule, and that she was overweight. (*Id.*).

On July 10, 2007, Dr. Turner dictated a letter notifying her that her laboratory studies showed normal hypertensive panel pattern, normal renal studies, and normal liver function, the latter of which Dr. Turner found "particularly reassuring." (Tr. at

423). Claimant was mildly anemic which Dr. Turner planned to evaluate with blood tests. (*Id.*).

On August 15, 2007, Claimant stated that she continued to be dyspneic on exertion, but that the bronchodilators somewhat improved her condition. (Tr. at 446). Her blood pressure was 124/82. (Tr. at 447). Her current problems were listed as dyspnea on exertion, COPD, cough, iron deficiency, and interstitial lung disease. (*Id.*).

### B. State Agency Examinations

In 1995, Claimant was referred to licensed psychologist William Given, M.A., at Occupational Analysis and Assessment Center ("OAAC") to determine the presence of a specific learning disability. (Tr. at 397). On a WAIS-R test, she earned a verbal IQ score of 87, a performance IQ score of 94, and a full scale IQ score of 89. (Tr. at 399). On a WRAT-3 test, she scored at the 8th grade level in reading and the 6th grade level in spelling and arithmetic. (*Id.*). She was diagnosed with a learning disorder of written expression. (Tr. at 401).

On December 18, 2006, Claimant was examined by Stephen B. Nutter, M.D., at Tri-State Occupational Medicine. (Tr. at 315-319). Claimant reported nausea, vomiting, and edema, but denied abdominal pain and hematochezia. (Tr. at 315). Claimant reported weekly headaches which she rated a "10" on a scale of "1" through "10" which caused nausea and photophobia; intermittent, non-radiating back pain and constant neck pain which radiated down her left arm; and joint pain. (Tr. at 316). Dr. Nutter's impression was that Claimant had COPD; chronic cervical and lumbar strain with no evidence of radiculopathy; and chest pain. (Tr. at 318). Regarding her back and neck, there were no range of motion abnormalities of her lumbar spine, her straight leg raise test was negative, she had no sensory abnormalities, her reflexes and muscle strength

was normal; these findings were not consistent with nerve root compression. (Tr. at 318-319). Her chest pain was atypically described as sharp pain, but her stress test was normal. (Tr. at 319). Her complaints probably did not represent anginal chest pains; there was no evidence of congestive heart failure and on examination, there was no S3 gallop, rales, or pitting edema. (*Id.*).  She did have joint pain, tenderness and crepitus, but no synovial thickening, periarticular swelling, or nodules or contractures consistent with rheumatoid arthritis. (*Id.*). X-rays of Claimant's chest showed her heart, lungs, and mediastinum to be within normal limits for her age with no evidence of acute disease within her chest. (Tr. at 320).

On December 19, 2006, William Given again evaluated Claimant, this time completing an adult mental profile consisting of a clinical interview and mental status examination. (Tr. at 324-330). Claimant's chief complaints were that she did not "feel good" since her surgery in 2004 due to high blood pressure, possible heart and lung problems, and almost continuous shortness of breath. (Tr. at 325). She also complained of frequent chest pain, diabetes, GERD following her stomach stapling procedure, arthritis pain in her hips and elbows, and regarding mental health, she reported that she was "not a happy camper." (*Id.*). She reported that her only mental health treatment was in 1988 for cocaine dependence when she was treated as an inpatient at Thomas Memorial Hospital and continued with outpatient treatment for two or three years. (Tr. at 326). Mr. Given diagnosed Claimant with moderate anxiety disorder, NOS; pain disorder associated with both psychological factors and a general medical condition; features of attention deficit hyperactivity disorder; learning disorder, NOS per self-report. (Tr. at 329). Her prognosis was poor to fair. (*Id.*).

16

Claimant gave Mr. Given "a detailed, longwinded explanation of how her daily activities [were] limited, but actually said very little about what she actually [could do]." (*Id.*). Her activities varied from day to day, depending on her medical symptoms; she set an alarm to avoid missing breakfast and triggering hypoglycemia and she then sometimes returned to bed. (*Id.*). If she felt well, she prepared one or two meals daily for her employer and herself. (*Id.*). She did not do a lot of housework, but her home did not require much attention. (*Id.*). She occasionally went on bike rides or walks with friends with whom she was once very active. (Tr. at 329-330). She shopped and performed errands a couple of times per month; she was able to wash clothes, pay her bills, and was independent with personal care chores, but sometimes could not shower because the moisture and heat caused her to become short of breath. (Tr. at 330).

Mr. Given rated Claimant's social functioning during the evaluation as mildly to moderately deficient because she was reasonably friendly and occasionally expressed humor, but dominated the conversations, had difficulty staying on subject, and cried briefly during the interview. (*Id.*). Her reported social activity was moderately deficient given that she continued to work in an individual's home preparing meals, was independent with personal grooming and hygiene, could shop when provided transportation, and could pay her bills and maintain residence. (*Id.*). Her concentration was mildly to moderately deficient; her persistence was not formally tested, and her pace was slow based on her obsessive attention to detail and longwinded stories. (*Id.*). She developed anxiety and worry in relation to pain and breathing problems and limited activities out of fear of having significant symptoms. (*Id.*).

On December 26, 2006, G. David Allen, Ph.D., completed a psychiatric review technique. (Tr. at 333-343). Dr. Allen found that Claimant suffered from non-severe

anxiety disorder, NOS and pain disorder associated with psychological and general medical conditions which rendered her only mildly restricted in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 333, 338, 339, 343). There were no episodes of decompensation of extended duration. (Tr. at 343). Dr. Allen noted that Claimant's allegations were medical, rather than psychological, that her credibility was established, and that she was capable from an emotional/mental functional standpoint. (Tr. at 345).

On January 2, 2007, Sharon Granata completed a physical RFC assessment, finding the following:

- Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry.

- Claimant could occasionally climb ramps, stairs ladders, ropes, and scaffolds and could frequently balance, stoop, kneel, crouch, and crawl.

- Claimant had no manipulative or visual limitations.

- Claimant should avoid concentrated exposure to extreme cold, extreme heat, fumes/odors/gases, and hazards, but had no limitation regarding wetness, humidity, noise, or vibration.

(Tr. at 362-365). There were no treating or examining source statements in the file. (Tr. at 367). Claimant activities of daily living indicated that she was able to take care of her personal needs without assistance, but had some difficulty washing her hair due to shoulder pain. (Tr. at 368). She could prepare simple meals, dust, sweep, do laundry, drive, and shop. (*Id.*). She reported that she could only lift 20 pounds. (*Id.*). She had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (*Id.*).   She was considered only partially credible as her reported limitations were not substantiated by the medical evidence of record to the degree

alleged. (*Id.*).

On March 22, 2007, A. Rafael Gomez, M.D., completed a physical RFC assessment, finding the same exertional and postural limitations as Ms. Granata, except finding that Claimant could frequently climb ramps and stairs and only occasionally crawl. (Tr. at 372-373). Dr. Gomez also found no manipulative or visual limitations and no communicative limitations. (Tr. at 374-375). He found that Claimant should avoid concentrated exposure to vibration, fumes, odors, gases, and hazards, but had no limitation regarding extreme cold, extreme heat, wetness, humidity, or noise. (Tr. at 375). Dr. Gomez noted that the new medical information mentioning postsurgical changes from gastric surgery and a hiatal hernia did not change Claimant's RFC. (Tr. at 376). There were no treating or examining source statements in the file. (Tr. at 377).

On March 23, 2007, Jeff Harlow, Ph.D., completed a psychiatric review technique. (Tr. at 379-391). Like Dr. Allen, Dr. Harlow found that Claimant suffered from non-severe anxiety and pain disorders which rendered her only mildly restricted in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 379, 384, 385, 389). There were no episodes of decompensation of extended duration. (Tr. at 389). Dr. Harlow agreed that Claimant's statements about her functional capacity limitations were only partially credible because there were inconsistent with treatment findings. (Tr. at 391). Also, because her functional capacities were only mildly deficient or within normal limits, her mental impairments were considered to be not severe. (*Id.*).

On October 5, 2007, Claimant was referred to licensed psychologist Rachel Arthur, M.A., for a diagnostic evaluation. (Tr. at 415). Claimant reported an onset of physical impairment on October 1, 2004 following her knee surgery; however, she did

not experience an onset of emotional impairment until May 2007. (Tr. at 415). She reported no history of mental health counseling or prescriptions for psychotropic medications; she reported one hospitalization for cocaine dependence. (*Id.*). Ms. Arthur diagnosed Claimant with major depressive disorder, single episode mild, based on Claimant's reports of feeling somewhat depressed nearly every day beginning in May of 2007 and her reports of lack of interest, excessive appetite, difficulty sleeping, loss of energy, irritability, and increased nervousness and worrying. (Tr. at 417). She also diagnosed Claimant with cognitive disorder, NOS, based on Claimant's reported memory problems following her car accident in 1988, as well as her reports of problems with concentration, problem solving, reading comprehension, and her variable subtest scaled scores. (*Id.*). Claimant's prognosis was fair, but would possibly improve with appropriate psychological and psychotropic interventions. (*Id.*). On the WAIS-III test, she scored a 89 in verbal IQ, a 77 in performance IQ, and a 82 in full scale IQ. (*Id.*).

## VI.   __Claimant's Challenges to the Commissioner's Decision__

Claimant argues that substantial evidence does not support the ALJ's finding that Claimant was not disabled prior to her biopsy and formal diagnosis of thyroid cancer and hepatitis C on August 24, 2007. (Pl.'s Br. at 8-11). She points out that her cancer "did not suddenly appear and manifest itself on August 24, 2007," therefore, "it is clear even for a lay person" that her cancer in combination with her other impairments rendered her disabled prior to August 24, 2007. (*Id.*).

The Commissioner responds that although Claimant's cancer most certainly existed prior to her diagnosis, there is no evidence of "actual disability" before that date. (Def.'s Br. at 11). The Commissioner argues that Claimant's overall health was reflected in her activities; although Claimant protested that she was unable to work after October

1, 2004, she continued to run her snack shop through June 2005 and worked as a house sitter in exchange for free rent until at least December 2006. (*Id.* at 11-12). In addition, the Commissioner contends that the uncontroverted opinion from agency expert Dr. Gomez, Claimant's longitudinal medical history, and inconsistencies casting doubt on Claimant's credibility suggest that Claimant could work prior to August 24, 2007. (*Id.* at 12-16).

## VII.   <u>Analysis</u>

Claimant challenges the ALJ's determination at the final step of the sequential evaluation. As discussed, the ALJ determined that Claimant was unable to perform her past relevant work prior to August 24, 2007; thus, the burden shifted to the Commissioner to establish that Claimant was capable of performing other substantial gainful activity considering her physical and mental capacities, age, education, and prior work experiences. Claimant acknowledges that the ALJ may use the opinion of a vocational expert as evidence that Claimant is capable of substantial gainful activity. However, Claimant cautions that the expert's opinion is valid only if the hypothetical question posed to the expert precisely sets out all of Claimant's impairments. Therefore, Claimant implicitly argues that the hypothetical questions which the ALJ posed to the vocational expert inaccurately represented Claimant's impairments and, consequently, both the vocational expert's opinion and the ALJ's ultimate finding that Claimant was capable of substantial gainful activity prior to August 24, 2007 were not supported by substantial evidence. The Court disagrees with Claimant's contention for the following reasons.

It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that fairly sets out the claimant's

impairments. *Walker v. Bowen,* 889 F.2d 47, 50-51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular Claimant's impairments and abilities. . ." *Id.* at 51. While questions posed to the vocational expert must reasonably reflect the claimant's impairments, the questions need only include those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987). Hypothetical questions may omit non-severe impairments as long as the questions include those impairments that the ALJ finds to be severe. *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983).

In this case, the vocational expert testified that Claimant's past relevant work as a proprietor/cashier of a snack shop was classified as light, unskilled work; her employment as a product specialist was classified as light, semi-skilled work; her work a telemarketer prior to her ascension into supervision was classified as sedentary, semi-skilled work; and finally, her work as a house-sitter was classified as light, unskilled work. (Tr. at 45). The ALJ then asked the vocational expert if an individual could perform Claimant's prior relevant work, assuming the following: an individual aged 47 to 51 (closely approaching advanced age); who has a high school education and some vocational training; with past relevant work as described above; with the RFC to perform light work with lifting up to 20 pounds occasionally and 10 pounds frequently, with standing or walking six hours total in an eight-hour workday, with sitting up to six hours in an eight-hour workday, with occasional climbing of ladders, ropes, scaffolds, occasional crawling and frequent climbing of ramps, stairs and balancing, and avoiding concentrated exposure to vibration, fumes, odors and hazards. (Tr. at 46). The vocational expert stated that an individual with the limitations described would be capable of performing Claimant's past work. (*Id.*). Further, the expert confirmed that

even if the hypothetical individual had additional limitations, including an inability to climb ropes and ladders and repetitively use her left upper extremity, the individual would still be capable of performing Claimant's past relevant work. (*Id.*). Finally, the vocational expert testified that if the individual was also limited to only routine changes in the work setting, then Claimant's prior work as a product specialist would be precluded. (Tr. at 46-47). However, the vocational expert testified that given all of the hypothetical limitations listed above, the individual still could perform substantial gainful activity, including, at the light level of exertion, a range of unskilled clerical work, cashier positions, and hand packaging positions, and at the sedentary level, positions as a non-emergency dispatcher, unskilled clerical work, and telephone order clerk, all of which existed in significant numbers in the regional and national economies. (Tr. at 47-48). Having reviewed the hypothetical limitations presented to the vocational expert and comparing them to the evidence of record, the Court finds that Claimant's limitations prior to August 24, 2007 were precisely as represented in the hypothetical questions posed to the vocational expert.

Although Claimant reported elevated blood pressure following her ACL reconstruction, it appeared to be influenced by the anesthesia administered for her surgery; her blood pressure subsequently remained in the higher normal range on examination. (Tr. at 220, 218, 269, 272, 286, 434, 441, 447). Further, Claimant concedes, and the records clearly indicate, that she recuperated very well following her right knee ACL reconstruction and that her knee did not continue to pose a significant impairment. (*See, e.g.*, Tr. at 223, 34). Claimant complained of dyspnea, reflux, and chest pain. (*Id.*). However, she reported kayaking and riding her bicycle to keep in shape with no pain during exercise. (Tr. at 265). Claimant's reflux and gastric pain was

assessed to be due to GERD status post gastric weight loss surgery. (Tr. at 287). She had a small sliding hernia without reflux. (Tr. at 288). Nexium provided some relief for her gastric problems. (Tr. at 265).  Claimant stated that her chest pain and shortness of breath was "off and on," not related to exertion, was not getting worse, and only "sometimes" limited her activity. (Tr. at 275). Claimant's EKG stress tests were unremarkable; she had regular hemodynamic response to exercise, no arrhythmias, and mild to moderately reduced functional capacity. (Tr. at 272, 484, 277). Pulmonary function tests suggested COPD of the emphysematous type. (Tr. at 435). Still, Claimant reported a 25 percent improvement in her breathing due to the medication Spiriva and that the tightness was partially relieved. (Tr. at 441).

Claimant also complained of neck and back pain, which was assessed as chronic cervical and lumbar strain with no evidence of radiculopathy, but she had no range of motion or sensory abnormalities, her straight leg test was negative, and her reflexes and muscle strength were normal. (Tr. at 318-319). She reported some difficulty washing her hair due to shoulder pain, but could take of her personal needs without assistance; she also stated that she could lift 20 pounds. (Tr. at 368). On May 15, 2007, a CT scan revealed that Claimant had a thyroid nodule and laboratory results showed that Claimant was positive for Hepatitis C. (Tr. at 425). However, subsequent treatment records did not reveal any significant restrictions due to these conditions until Claimant was diagnosed with and began treatment for thyroid cancer following an August 24, 2007 biopsy.

The ALJ accounted for Claimant's physical limitations as supported by the above treatment records in the hypothetical she posed to the vocational expert. Further, the hypothetical comported with the agency expert's determinations of Claimant's physical

capabilities. Ms. Granata found that Claimant was capable of light work with non-exertional limitations of occasionally climbing ramps, stairs ladders, ropes, and scaffolds and avoiding concentrated exposure to extreme cold, extreme heat, fumes/odors/gases, and hazards. (Tr. at 362-365). Dr. Gomez, M.D., found the same exertional and postural limitations, except finding that Claimant could frequently climb ramps and stairs and only occasionally crawl and should avoid concentrated exposure to vibration, fumes, odors, gases, and hazards. (Tr. at 372-375). Claimant's treating sources did not provide physical RFC assessments.

Moreover, the ALJ included Claimant's mental limitations in the hypothetical posed to the vocational expert to the extent that they were supported by the evidence. Although the ALJ was not required to include Claimant's mental limitations because they were found to be not severe, the ALJ restricted the hypothetical to an individual who is capable of only routine changes in the work setting. The evidence does not support that Claimant suffered from any additional mental impairments which were severe enough to warrant inclusion in the ALJ's hypothetical. In December 2006, Claimant reported that she was "not a happy camper." (Tr. at 325). However, she later reported that she did not have onset of an emotional impairments until May 2007. (Tr. at 415). The record is devoid of mental health treatment records because Claimant did not receive any mental health treatment except for cocaine dependence in 1988, nor was she prescribed psychotropic medications. (Tr. at 326). On evaluation, Dr. Allen found Claimant only mildly restricted in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 343). He found that she was capable from an emotional/mental functional standpoint. (Tr. at 345). Dr. Harlow also found Claimant only mildly restricted in the above functional areas and

concluded that her mental impairments were not severe. (Tr. at 389 and 391).

In addition to challenging the adequacy of the ALJ's hypothetical questions, Claimant attacks the ALJ's determination as to the disability onset date. Claimant suggests that the ALJ determined the disability onset date to be the same as Claimant's date of cancer diagnosis simply for expediency; thereby, ignoring indisputable medical evidence that Claimant's thyroid cancer pre-existed its diagnosis and "rendered her disabled in combination with her other severe medical conditions and impairments before August 24, 2007." The Court rejects this claim; first, because it is a mischaracterization of the decision, and second, because the medical evidence, as previously stated, fails to support Claimant's conclusion. The ALJ does not suggest that Claimant's thyroid cancer suddenly appeared on August 24, 2007; rather, the ALJ finds that the effects of Claimant's cancer, when combined with her other impairments, did not result in limitations that prevented Claimant from engaging in substantial gainful activity prior to that date. This judgment is reasonable and is fully supported by the treatment records and agency evaluations.

As the ALJ noted, Claimant's diagnosis led to a total surgical dissection of her thyroid, radioactive iodine ablation, and thyroid hormone replacement therapy. These interventions resulted in Claimant suffering from suboptimal thyroid levels and increased respiratory difficulties, with systemic symptoms including weight gain, night sweats, and fatigue. As such, the ALJ did not select the date of disability onset solely because it corresponded with the diagnosis of Claimant's cancer; instead, the ALJ found the date of diagnosis to be the disability onset date, because it was the point in time at which Claimant commenced a course of treatment that was, in combination with her other physical and mental impairments, disabling.

26

Therefore, the Court finds that the ALJ established by substantial evidence through vocational expert testimony that Claimant, considering her age, education, skills, work experience, and physical and mental limitations, could perform substantial gainful activity which existed in significant numbers in the national economy prior to August 24, 2007. Accordingly, substantial evidence supports the Commissioner's decision that Claimant was not disabled prior to August 24, 2007.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** June 27, 2011.

Cheryl A. Eifert
United States Magistrate Judge